**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,**

     **Plaintiff,**

     **v.**

**U.S. DEPARTMENT OF JUSTICE,**

     **Defendant.**

        **Civil Action No. 12-1491 (JDB)**

---

## MEMORANDUM OPINION

More than four years ago, Citizens for Responsibility and Ethics in Washington sought information about the Department of Justice's criminal investigation of former senator John Ensign. After lengthy litigation under the Freedom of Information Act—and two orders from this Court—CREW obtained several thousand pages of responsive material. CREW now seeks attorneys' fees to cover the costs of the litigation. The Court finds that CREW is entitled to recover fees and it will award $32,865.19.

## BACKGROUND

Some years ago, the federal government investigated Senator John Ensign but, as Ensign announced publicly, ultimately elected not to bring any charges. See CREW v. DOJ, 978 F. Supp. 2d 1, 4 (D.D.C. 2013). Curious about that decision, CREW submitted FOIA requests to the DOJ, the FBI, and the Executive Office for United States Attorneys. Each request asked for "all records related to DOJ's and the FBI's investigation of Senator John Ensign (R-NV), including but not

limited to DOJ's decision not to bring criminal charges against him that are not covered by grand jury secrecy." Id. at 5 (alteration and internal quotation marks omitted).

Each agency denied CREW's requests under FOIA Exemptions 6 and 7(C), which protect personnel, medical, and law enforcement records from disclosure that would constitute unwarranted invasions of personal privacy. Id.; see also 5 U.S.C. § 552(b)(6), (b)(7)(C). Indeed, the FBI and the EOUSA did not even perform a search. CREW, 978 F. Supp. 2d at 5. Instead, the government elected to categorically withhold all responsive documents rather than evaluate each document individually and provide a Vaughn index explaining any withholdings. DOJ's Office of Information Policy affirmed the government's decisions on appeal, although on slightly different grounds. Id. And so CREW filed suit, and eventually a motion for summary judgment, in this Court, arguing that the government had wrongfully withheld responsive documents. See id.

In addressing the parties' cross-motions for summary judgment on that issue, the Court "recognized [that,] in the context of Exemption 7(C)[,] 'privacy interests are particularly difficult to overcome when law enforcement information regarding third parties is implicated.'" Id. at 7 (quoting Martin v. DOJ, 488 F.3d 446, 457 (D.C. Cir. 2007)). Thus, agencies "categorically deny all requests for law enforcement records regarding third parties in the absence of an 'overriding' public interest (or proof of death or a privacy waiver, neither of which are at issue in this case)." Id. at 8. And the DOJ had "concluded here that CREW had not articulated an 'overriding' public interest." Id.

The Court agreed with the government's position that Senator Ensign "enjoys a significant privacy interest in the substance of the investigative files"—although that interest is "substantially diminished" by his public announcement acknowledging the fact of the investigation itself. Id. at

11. But the Court also found that "the public has a substantial interest in DOJ's decision not to prosecute him, considering the circumstances." Id. at 12. After all, "Senator Ensign purportedly resigned under threat of expulsion from the Senate." Id. at 13. And "the public—and Congress—would benefit from knowing that DOJ gives serious consideration to referrals from Congress." Id. at 14. Balancing these interests, the Court concluded that "[a]pplication of DOJ's categorical rule is . . . not appropriate." Id.

Thus, the government's categorical withholding could not stand. Instead, the government was ordered to evaluate Senator Ensign's privacy interests and the resulting availability of exemptions on a document-by-document basis. Id. The government was required to submit a Vaughn index that identified each document withheld, along with a "relatively detailed justification" for each. Id. at 15. As the Court explained, "submission of a Vaughn Index here w[ould] not harm Senator Ensign's privacy interests in not being identified as the subject of an investigation—that ship has sailed. And the privacy interests of other third parties mentioned in the records but not already publicly known can be protected adequately by redaction of identifying information." Id. at 14–15 (citations omitted).

But the government failed to meet the deadline to produce that Vaughn index—even after an extension. See Feb. 14, 2014 Mem. Op. & Order [ECF No. 21] at 2. And on the eve of a status conference to address that issue, the government filed a motion requesting another lengthy extension—and "that it be permitted to submit representative 1% sample Vaughn indices of the 86,000 and 120,000 pages of responsive documents in the custody of the [DOJ] Criminal Division and the EOUSA, respectively." Id. The Court voiced concern with the FBI's dilatory conduct: "Had it been processing documents since [the Court's previous Order] at the rate it now proposes . . ., it would have completed processing the 8,000 pages by now, and CREW would already be in

possession of a wealth of non-exempt information." Id. at 4. And the Court expressed surprise at the "unusual fashion" in which the DOJ and EOUSA wished to proceed. Id. at 5. After all, the DOJ "cite[d] no case where a court has permitted an agency to provide a representative Vaughn index before processing all responsive documents." Id. Moreover, "until [the] DOJ processes responsive records, releases non-exempt records, and withholds documents in part or in full pursuant to FOIA exemptions, CREW and the Court cannot test its exemption claims through sampling or otherwise." Id. "In effect," the Court explained, the "DOJ want[ed] an advisory opinion on how the Court views its preliminary stances on withholding so that it c[ould] code, withhold, and redact accordingly." Id. at 6. The Court therefore denied the DOJ's motion for representative sampling and ordered production to continue. Id. at 7–9.

The government appears to have complied with this second Order, processing thousands of pages of responsive material (though far fewer than estimated in the second round of briefing), releasing many in full or in part, and providing Vaughn indices explaining its withholdings. See Pl.'s Mem. [ECF No. 38-1] at 8–9. CREW did not challenge any of the withholdings. See Oct. 28, 2014 Status Report [ECF No. 31]. CREW has, however, moved for attorneys' fees to reimburse its costs in pursuing this FOIA action. That is the issue presently before this Court.

## ANALYSIS

"The Freedom of Information Act provides for the recovery of [reasonable] attorneys' fees in cases brought under its provisions where the complainant has 'substantially prevailed.'" Chesapeake Bay Found., Inc. v. U.S. Dep't of Agric., 11 F.3d 211, 215 (D.C. Cir. 1993) (quoting 5 U.S.C. § 552(a)(4)(E)). Courts analyze this issue in two steps: first, eligibility, and second, entitlement. Id. at 216. As both parties agree that CREW is statutorily eligible for attorneys' fees, see Def.'s Opp'n [ECF No. 40] at 5 n.1, the Court need only address CREW's entitlement to fees.

That is, CREW "may" receive fees, but the Court must determine whether it "should." See Brayton v. Office of the U.S. Trade Rep., 641 F.3d 521, 524 (D.C. Cir. 2011). If the Court determines that CREW is entitled to recover fees, then it must calculate the appropriate award.

## I.   ENTITLEMENT TO ATTORNEYS' FEES

The D.C. Circuit has instructed this court "to consider at least four criteria in determining whether a substantially prevailing FOIA litigant is entitled to attorney's fees: (1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding." Tax Analysts v. DOJ, 965 F.2d 1092, 1093 (D.C. Cir. 1992). The second and third factors—commercial benefit and plaintiff's interest—"are closely related and often considered together." Id. at 1095. Indeed, "the first three factors assist a court in distinguishing between requesters who seek documents for public informational purposes and those who seek documents for private advantage." Davy v. CIA, 550 F.3d 1155, 1160 (D.C. Cir. 2008). "The sifting of those criteria over the facts of a case is a matter of district court discretion," Tax Analysts, 965 F.2d at 1094 (citation omitted), and "[n]o one factor is dispositive," Davy, 550 F.3d at 1159.

The government does not attempt to refute CREW's argument that the first three factors weigh in CREW's favor—but the Court would agree as to the disposition of those factors in any event. CREW is a nonprofit organization "dedicated to promoting ethics and accountability in government and public life." About Us, CREW, www.citizensforethics.org/pages/about. CREW advances that mission in part by "bring[ing] unethical conduct to the public's attention." Id. Thus, CREW's interest is "for public informational purposes," rather than "private advantage." Davy, 550 F.3d at 1160; see also CREW v. DOJ, 820 F. Supp. 2d 39, 45 (D.D.C. 2011) (finding that the second and third factors "militate strongly in favor" of CREW, as it is a nonprofit organization

that "freely and publicly disseminates those records it acquires through FOIA requests"). And the public did indeed derive a benefit from this litigation: CREW published a free, if short, report (helpfully entitled "What CREW Has Learned About the John Ensign Investigation and Why He Was Never Prosecuted," available at http://www.citizensforethics.org/pages/what-crew-has-learned-about-the-john-ensign-investigation-nevada), and "provided the files to The New York Times," which in turn presented national coverage of the government's decision-making process in declining to charge Senator Ensign. Eric Lichtblau, Documents Reveal Details of F.B.I. Inquiry Into Nevada Senator, N.Y. Times, Dec. 30, 2014, at A12. The public is likely interested in assessing how and why the Department of Justice exercises its prosecutorial discretion—particularly in regard to high-profile public figures. Thus, CREW's pursuit and dissemination of these documents "is likely to add to the fund of information that citizens may use in making vital political choices." Cotton v. Heyman, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (internal quotation marks omitted); see also CREW v. DOJ, No. 11-1021, 2014 U.S. Dist. LEXIS 182097, at *9 (D.D.C. Oct. 24, 2014) (finding that "CREW's FOIA request concerned a matter of undeniable public import" where "[t]he public had a clear interest in documents concerning [Representative Jerry] Lewis's investigation, especially considering the backdrop of broader public concerns about the DOJ's handling of allegations of corruption leveled against high-ranking public officials" (alteration and internal quotation marks omitted)). Hence, the Court concludes that the first three factors weigh in CREW's favor.

"The fourth factor considers whether the agency's opposition to disclosure had a reasonable basis in law, and whether the agency had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior." Davy, 550 F.3d at 1162 (internal quotation marks and citation omitted). "The question is not whether [CREW] has affirmatively

shown that the agency was unreasonable, but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [CREW] filed suit." Id. at 1163. While this factor is fair grounds for discussion, CREW prevails here as well.

The agency's position in the second round of briefing—asking to produce representative sample Vaughn indices—was unreasonable. As the Court has previously explained, the government "cite[d] no case where a court ha[d] permitted an agency" to proceed along those lines. Feb. 14, 2014 Mem. Op. & Order at 5. "In effect," the government sought "an advisory opinion." Id. at 6. Thus, the agency had no "reasonable basis in law" for seeking to produce sample indices before processing CREW's request. And so this round of briefing, requiring a second opinion from the Court, served only to delay the inevitable: production of non-exempt documents.

The government barely addresses this second round of briefing, and only does so to point out that "after the [DOJ] processed and released thousands of pages of records and provided Vaughn indices, CREW did not further challenge any of [the government's] withholdings." Def's Opp'n at 9. According to the government, then, "this was not a case where a defendant sought merely to stonewall based on frivolous exemption claims," and so a fee award is not merited. Id. But the appropriate inquiry does not center on the ultimate validity of the government's withholdings. After all, the government did not create the unchallenged Vaughn indices—nor produce, or even process, the relevant documents—until forced to do so by Court order after lengthy resistance. Delay tactics are just another form of stonewalling. See Davy, 550 F.3d at 1163 ("It is not enough to say that once the agency faced a justiciable FOIA claim, it offered no resistance, because the agency did not disclose the documents until after [the plaintiff] had pursued litigation, including filing a cross-motion for summary judgment and negotiating a release schedule." (alteration, internal quotation marks, and citation omitted)). Hence, all four factors

weigh in favor of CREW as to the second round of briefing, and CREW is entitled to attorneys' fees as to those costs.

For the first round of briefing—the cross-motions for summary judgment regarding the blanket exemption—the fourth factor is (if marginally) "a closer call." CREW v. DOJ, 2014 U.S. Dist. LEXIS 182097, at *10. "At the time of suit, . . . [the government's] policy had recently been upheld by another court in this district." See id. at *11 (citing Graff v. FBI, 822 F. Supp. 2d 23, 35–37 (D.D.C. 2011) (upholding the policy in general, not as applied to a particular case)). And this Court did agree with the government's position that Senator Ensign had a significant privacy interest in the documents requested. But in constructing its litigating position, the government had the benefit of other recent cases finding categorical withholding inappropriate where the FOIA requester sought information about a publicly acknowledged investigation of a public figure. See CREW v. DOJ, 846 F. Supp. 2d 63, 75–76 (D.D.C. 2012) (finding categorical withholding inappropriate and requiring a Vaughn index regarding criminal investigation of Representative Jerry Lewis); CREW v. DOJ, 840 F. Supp. 2d 226, 236 (D.D.C. 2012) (finding categorical withholding inappropriate and requiring a Vaughn index regarding criminal investigation of Representative Don Young). In its motion for summary judgment in this case, the government acknowledged these adverse rulings, but "respectfully disagree[d] with the courts' analysis in those cases." Def.'s Mem. Supporting Mot. for Summ. J. [ECF No. 8-1] at 20. The government is certainly free to disagree with a court's analysis—but simply stating that two courts in this district got it wrong is not the stuff of a reasonable litigating position.

The government did attempt to distinguish those cases as "involv[ing] serious allegations of corruption on matters affecting the public fisc," whereas this case, according to the government, involved "allegations of a highly personal nature." Id. at 21. But the fact that Senator Ensign's

alleged criminal conduct stemmed from an affair does not render any public concern mere "tabloid interest." Id. Investigations into potential violations of lobbying laws are matters of public interest whether or not their surrounding circumstances are more salacious than usual. And the government's exercise of prosecutorial discretion—especially as it relates to a public figure—is hardly the subject of prurient voyeuristic fixation. Allegations that a senator violated lobbying laws are not "of a highly personal nature," and it is unreasonable to say otherwise. Id. Given the similarity of these cases, then, the Court finds it difficult to say that the government's desire to categorically withhold all responsive documents had a reasonable basis in law. See CREW v. DOJ, No. 11-754, 2014 U.S. Dist. LEXIS 182098, at *7–12 (D.D.C. Aug. 4, 2014) (holding CREW was entitled to attorney's fees in the case involving Representative Young's investigation, as the government's litigating position in withholding documents was unreasonable).

But "even if [the government] did prevail on this one factor, CREW's success on the first three would still tip the balance in favor of awarding fees." CREW, 2014 U.S. Dist. Lexis 182097, at *11. Because courts "must be careful not to give any particular factor dispositive weight," Nationwide Bldg. Maint., Inc. v. Sampson, 559 F.2d 704, 714 (D.C. Cir. 1977), a close call on the fourth factor cannot outweigh the fact that the other three factors "militate strongly" in favor of CREW. CREW, 2014 U.S. Dist. LEXIS 182097, at *8.[1] This balance accords with "the basic policy of the FOIA to encourage the maximum feasible public access to government information and the fundamental purpose of section 552(a)(4)(E) to facilitate citizen access to the courts to

---

[1] The government suggests that the fourth factor is, perhaps, dispositive after all. See Def.'s Opp'n at 6 ("Failure to show that the government's withholding lacked a reasonable basis in law may foreclose a claim for attorney fees." (internal quotation marks omitted)). But the government overreads the case on which it relies for that proposition. In Chesapeake Bay Foundation, Inc. v. U.S. Department of Agriculture, the D.C. Circuit explained that the fourth factor is dispositive only where "the Government's position is correct as a matter of law"—that is, where the government's "legal basis for withholding requested records is correct." 11 F.3d 211, 216 (D.C. Cir. 1993). Otherwise—if, for instance, "the Government's position is founded on a colorable basis in law[—]that will be weighed along with other relevant considerations in the entitlement calculus." Id. Here, of course, the Court previously found that the government's position was not correct as a matter of law. And so the fourth factor is not dispositive.

vindicate their statutory rights." <u>Nationwide Bldg.</u>, 559 F.2d at 715.  CREW, then, is both eligible for and entitled to attorneys' fees for both rounds of briefing—and the Court need only determine the amount.

## II.   AMOUNT OF ATTORNEYS' FEES

"The usual method of calculating reasonable attorney's fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar' amount."  <u>Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc.</u>, 136 F.3d 794, 801 (D.C. Cir. 1998). [2]  Based on this method, CREW seeks $63,827.40 in attorneys' fees, as well as $550 in costs.  <u>See</u> Pl.'s Reply [ECF No. 43] at 20.  But the government challenges CREW's calculation from both sides, arguing that the hours expended are inadequately documented (or constitute inappropriate line-items), and that CREW seeks an excessive hourly rate. The Court will consider each of these objections in turn.

### A.   Hours Reasonably Expended

CREW "has the burden of establishing the reasonableness of its fee request, and supporting documentation must be of sufficient detail and probative value to enable the [C]ourt to determine with a high degree of certainty that such hours were actually and reasonably expended."  <u>Role Models Am., Inc. v. Brownlee</u>, 353 F.3d 962, 970 (D.C. Cir. 2004) (alteration, internal quotation marks, and citation omitted).   Thus, "fees and costs should not be awarded for excessive, redundant, or otherwise unnecessary work."  <u>Summers v. DOJ</u>, 477 F. Supp. 2d 56, 63–64 (D.D.C. 2007); <u>see also</u> <u>Envtl. Def. Fund, Inc. v. Reilly</u>,  1 F.3d 1254, 1258 (D.C. Cir. 1993) ("[W]e properly disallow time spent in duplicative, unorganized or otherwise unproductive effort." (internal

---

[2] Decisions that "involve different fee-shifting statutes" are "instructive in construing the applicable 'reasonable' standard that applies to fee awards under FOIA." <u>Judicial Watch, Inc. v. U.S. Dep't of Commerce</u>, 470 F.3d 363, 374 (D.C. Cir. 2006).  The Court will therefore rely in this discussion on fee-shifting cases both within and outside the FOIA context.

quotation marks omitted)).   Should a prevailing party request "an outrageously unreasonable amount," courts may deny the application for fees in its entirety.  Envtl. Def. Fund, 1 F.3d at 1258 (internal quotation marks omitted).   And "[i]n a case of less egregious overbilling, [courts] may impose a lesser sanction," such as reducing the award.  Id.  Complaining that CREW inadequately documented its time, the government seeks a blanket denial—or, in the alternative, substantial reductions of the award.  See Def.'s Opp'n at 12.

In this Circuit, courts "require that fee applications include contemporaneous time records of hours worked and rates claimed, plus a detailed description of the subject matter of the work with supporting documents, if any."  In re Donovan, 877 F.2d 982, 994 (D.C. Cir. 1989) (per curiam).  The government contends that CREW falls far short of that standard—and has for some time.   Just a few years ago, for instance, another court in this Circuit held that CREW's "timekeeping practices fell significantly below what is expected of fee applicants in this Circuit." CREW v. DOJ, 825 F. Supp. 2d 226, 230 (D.D.C. 2011).   In that case, the same counsel whose time records are at issue here kept daily time sheets with hourly (and sometimes half-hourly) increments designated to specific cases, but not to specific tasks.  See id.  Counsel then cross-referenced her time sheet with her files, notes, and calendar to attribute particular time to particular tasks.  See id.  The court was unimpressed by this procedure, and pointed out that "CREW offer[ed] no real excuse for its inadequate timekeeping habits."  Id.  As a result, the court reduced CREW's fees by 37.5% —"splitting the 75% difference between billing in quarter-hour versus full-hour increments"—and expressed its "confiden[ce] that [CREW's] counsel will maintain better contemporaneous records and record their time in more appropriate increments" if they "wish[] to receive unreduced fee awards in the future."  Id. at 231.  The government maintains that CREW has not vindicated that confidence, and so seeks a more substantial sanction to get the point across.

The government first complains that CREW's counsel used "overbroad time increments" in its billing summary.  See Def's Opp'n at 12.  Indeed, counsel Anne Weismann's original declaration failed to describe the increments she used in preparing her billing summary.  See generally Ex. A to Pl.'s Mot. [ECF No. 38-2].  She later explained, however, that her "general practice was to round down to the nearest 15-minute increment."  Ex. A to Pl.'s Reply [ECF No. 43-1] at 2.  She has also averred that she "typically reduced [her] hours assigned to a specific litigation task by at least ten percent."  Ex. A to Pl.'s Mot. at 3.

The government rightly contends that ten-minute or six-minute increments are "more accurate."  Thomas ex rel. A.T. v. District of Columbia, No. 03-1791, 2007 WL 891367, at *4 (D.D.C. Mar. 22, 2007); see also Am. Civil Liberties Union v. U.S. Dep't of Homeland Sec., 810 F. Supp. 2d 267, 279 n.7 (D.D.C. 2011) ("[T]he plaintiff is frequently involved in other litigation in this Court and is on notice that payment based on quarter-hour billing increments will not be condoned."); Blackman v. District of Columbia, 59 F. Supp. 2d 37, 44 n.5 (D.D.C. 1999) ("[P]laintiffs' primary counsel has [with a few exceptions] billed in quarter hour increments.  In the future, the Court will not award fees where plaintiffs' counsel has not calculated his time in tenth-hour increments.").

But the courts in this district have not been uniform in these admonitions.  Indeed, the very case on which the government relies (for the proposition that CREW failed to learn its lesson) suggests that quarter-hour increments could be acceptable.  CREW, 825 F. Supp. 2d at 230.  This Court is perplexed that CREW—a frequent litigant before this Court, and well versed in the requirements for recovering attorney's fees in FOIA cases—remains steadfast in its apparent refusal to join the standard articulated by so many judges in this district.  And the Court remains hopeful that CREW will adjust its billing practices accordingly.  In this instance, however, where

Weismann avers that she rounded down to the nearest fifteen-minute increment, and otherwise reduced her hours, the Court does not deem quarter-hour increments so imprecise as to merit a reduction on that basis alone. See CREW v. FEC, 66 F. Supp. 3d 134, 151 (D.D.C. 2014) ("declin[ing] to reduce CREW's attorney fee award based on CREW's keeping of time in half-hour and hour increments" where Weismann similarly declared that "she often reduced her hours assigned to a specific task by ten percent").

The government expresses similar frustration, however, with the descriptions Weismann employed in her billing summary. Although a "fee application need not present the exact number of minutes spent nor the precise activity to which each hour was devoted," Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1327 (D.C. Cir. 1982) (internal quotation marks omitted), applicants must provide "a detailed description of the subject matter of the work," Donovan, 877 F.2d at 994. And Weismann's billing summary is more sparse than detailed. Although she explains which document she was working on, and whether she was spending her time on Westlaw or Word, she does not go much further. Entries such as "Research SJ Opposition," "Draft SJ Opposition," "Finalize Reply," and "Read DOJ's Reply and Opp." abound. Ex. A to Pl.'s Mot. at 5.

CREW is right to say that these descriptions are better than some that courts in this circuit have held inadequate. See, e.g., Donovan, 877 F.2d at 995 (finding documentation insufficient where descriptions included "legal issues," "conference re all aspects," or "call re status"). But these descriptions are also quite similar to some that courts in this circuit have rejected—and so that argument does not get CREW very far. See, e.g., CREW v. U.S. Dep't of Homeland Sec., No. 08-1046, 2010 WL 8971920, at *2 (D.D.C. Apr. 21, 2010) (finding that time records such as "research, draft and final prep of plaintiff's opposition and cross-motion for SJ; confer w/co-

counsel" "lack the adequate detail that would permit the Court to evaluate whether CREW's fee request is justified" (alteration omitted)); Conservation Force v. Salazar, 916 F. Supp. 2d 15, 28 (D.D.C. 2013) (finding that "general descriptions," such as "research Wood Bison II" and "Opposition to Motion to Strike" merit a reduction in hours compensated).

Here, too, CREW can and should do better. Indeed, it has an example of adequate description quite close to home. David Sobel's billing summary for the reply brief for this very motion is more detailed. See Ex. C to Pl.'s Reply [ECF No. 43-3] at 3 (including entries such as "Research & drafting re 'reasonable basis'" and "Drafting re Laffey rates"). And it has the virtue of billing in six-minute increments. Id. There is no reason that the rest of CREW's counsel cannot conform to this relatively low, but entirely reasonable, bar. But while the Court is dismayed by CREW's submission, it is nonetheless able to "make an independent determination whether or not the hours claimed are justified." Indeed, the overall reasonability of the total hours expended is one of the few things the government does not contest. And so a reduction is not warranted on this basis alone either. See CREW v. FEC, 66 F. Supp. 3d at 153 (noting that court views billing entries with a less demanding eye where the request is "not unreasonable on its face").

In the government's view, however, the broad time increments and broader descriptors are symptomatic of a more generalized sloppiness in CREW's timekeeping. And that point is well taken. Of particular concern is CREW's failure to provide contemporaneous timekeeping records. See Def.'s Opp'n at 12. The D.C. Circuit has long held that "[c]asual after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees." Concerned Veterans, 675 F.2d at 1327. Thus, "[a]ttorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney." Id.

Other courts have criticized Weismann for failing to meet this standard.  See CREW, 2014 U.S. Dist. LEXIS 182097, at *18–19 (stating that Weismann's explanation of her billing practices is "even less detailed" and "provides even less clarity" than previous explanations the court had found inadequate).  And nothing, really, has changed.  This is how Weismann describes her time calculations in this case:

> In order to determine my time for purposes of recovering our fees in this matter, I reviewed my daily time sheets, separate notes I maintain on individual cases, and records in an electronic time keeping system CREW implemented in October 2013 for litigation.

Ex. A to Pl.'s Mot. at 3.  Compare that paragraph to Weismann's explanation in a previous case—an explanation that was deemed insufficient:

> I reviewed my daily time sheets and separate notes I maintain on individual case. In addition, since October 2013, CREW has implemented an electronic timekeeping system specifically for litigation.  I reviewed those records as well to determine the total amount of time I spent on this case.

CREW, 2014 U.S. Dist. LEXIS 182097, at *19.  If there is a substantive difference between these paragraphs, the Court is unable to discern it.  "Not only does Weismann again calculate her time based on a post-hoc 'review' of daily time sheets and separate notes, but she also provides [insufficient] clarity of how she came to attribute her time to any specific task."  Id. (internal quotation marks omitted).  And, as in the previous case, the electronic timekeeping system came a bit late: it is relevant to the second round of briefing, but the motion for summary judgment was briefed and decided before the system's implementation.  See id. at *19–20.

Once again, however, the courts in this district have not always evaluated Weismann's similar affidavits in a similar way.  In CREW v. FEC—another case in which Weismann's declaration closely resembles the one filed here—the court found "no indication that CREW engaged in post hoc reconstruction of hours."  66 F. Supp. 3d at 150 (adopting magistrate judge's

report and recommendation).   The court distinguished that case from previous Weismann declarations that give a bit more detail about what "daily time sheets" might mean.  See, e.g., CREW v. DOJ, No. 10-750, Ex. to Pl.'s Mot. for Atty. Fees [ECF No. 7-2] at 60 ("Like all other employees of CREW, I maintain daily time sheets.  These records indicate the number of hours (and in some cases half-hour increments) I have spent on specific cases, but do not itemize the specific tasks I performed for each of those cases."); CREW v. Dep't of Homeland Sec., No. 08-1046, Weismann Decl. [ECF No. 50-4] at 1 (same).  That additional paragraph, the court inferred, was demonstrative of post-hoc reconstruction.  See CREW, 66 F. Supp. 3d at 150 (adopting magistrate judge's report and recommendation).   Its absence, therefore, indicated contemporaneous timekeeping.  See id.

This Court appreciates the difficulty in reconciling these outcomes: indeed, Weismann's affidavit is inherently ambiguous.  One court has opined that "[c]learly a 'daily' time record is a 'contemporaneous' one."  CREW, 2014 U.S. Dist. LEXIS 182098, at *18.  And another has said that calculating one's time based on a "review" of other notes necessarily is a post-hoc rationalization.  See CREW, 2014 U.S. Dist. LEXIS 182097, at *19.  There is no obvious rule to suggest that one reading is superior to the other.  But there is a rule that aids the Court's analysis: the burden of proving the reasonableness of requested fees is on the party seeking them.  See Role Models, 353 F.3d at 969–70.  In this Court's view, the very ambiguity in Weismann's affidavit demonstrates that she has not fully met her burden.  The problem could be ameliorated, of course, by a clearer explanation of how the daily time sheets work, and whether they are indeed a contemporaneous record—no large burden on the affiant.  But Weismann's silence on these topics does not carry that burden.

This ambiguity could also be resolved by disclosing the daily time sheets themselves. Finding Weismann's explanation inadequate, the government made just such a request here. <u>See</u> Ex. A to Def.'s Opp'n [ECF No. 40-1] at 5 (asking that CREW disclose "the records that were relied upon according to the [Weismann and Sloan] declarations," including "the time sheets, the electronic time-keeping records, and the separate notes"). According to the government, "CREW refused to provide all the records that were relied upon in constructing the billing summaries," but did "disclose[] . . . a one-page, incomplete excerpt of what appears to be Ms. Weismann's time sheet from the electronic system CREW says it implemented in October 2013." Def.'s Opp'n at 16. "No other reliance records described in [the] declarations," however, "were disclosed." <u>Id.</u>

CREW's failure to disclose all of its records is troubling on multiple fronts. First, it is inconsistent with the Court's expectations of parties' conduct in such cases: "This circuit and others have indicated that contemporaneous time charges should be filed with the motion for attorneys' fees as a matter of course, and certainly should be provided once legitimate questions are raised by the opposing party." <u>Kennecott Corp. v. EPA</u>, 804 F.2d 763, 767 (D.C. Cir. 1986) (per curiam).

Second, the single page CREW did provide reveals discrepancies between the hours entered on the electronic timesheet and those reported in the billing summary presented to this Court. For instance, the electronic timesheet records 1.59 hours on December 12, 2013, spent preparing for a status conference and responding to the government's motion. <u>See</u> Ex. A to Def.'s Opp'n at 8. But the billing summary reflects two hours for that work on that date. <u>See</u> Ex. A to Pl.'s Mot. at 5. And where the electronic timesheet records .75 hours for editing and filing CREW's opposition on January 15, 2014, <u>see</u> Ex. A to Def.'s Opp'n at 8, the billing summary reflects only .45 hours, <u>see</u> Ex. A to Pl.'s Mot. at 5. The Court does not suggest that these

discrepancies are intentional—indeed, the latter mistake is to CREW's detriment.  And one can see how these mistakes were made: if 1.59 is misread as hour and minutes, instead of hundredths of an hour, one might easily round up to two.  Similarly, 45 minutes might be misconstrued as .45 hours.

But the fact of the errors—mens rea aside—exemplifies the importance of providing contemporaneous time-keeping records: it allows the opposing party, and the court, to double-check the accuracy of the proposed billing summary.[3]  And that check is needed here.  CREW responds that the government's ability to mount an opposition shows that it has enough information to validate the billing summary.  See Pl.'s Reply at 8.  But the government was able to do so, in part, because it had access to the electronic timesheet.  It might well mount a more thorough opposition—or find further errors in calculation—were it granted access to CREW's complete billing records.  CREW has chosen to deny access and thereby to reduce the likelihood of accuracy.  To offset that uncertainty—and CREW's resulting failure to satisfy its burden—a fee reduction is appropriate.[4]  See CREW v. U.S. Dep't of Homeland Sec., 2010 WL 8971920, at *2 (reducing CREW's fees by 10% where, among other issues, CREW failed to produce contemporaneous billing records (daily time sheets) and refused to provide them to the government when requested).

The Court declines the government's invitation to deny all fees—a sanction "to be reserved for only the most severe of situations, and appropriately invoked only in very limited circumstances," such as "when the party seeking fees declines to proffer any substantiation in the

---

[3] Indeed, that check is the reason the Court is entertaining these arguments; "nit-picking claims by the [g]overnment should [not] be countenanced" for their own sake.  Concerned Veterans, 675 F.2d at 1338 (Tamm, J., concurring).

[4] In its reply, CREW acknowledged the "computation errors" the government pointed out, and accordingly reduced the amount of compensation it sought by one hour.  See Pl.'s Reply at 12 n.6.

form of affidavits, timesheets or the like, or when the application is grossly and intolerably exaggerated, or manifestly filed in bad faith." Jordan v. DOJ, 691 F.2d 514, 518 (D.C. Cir. 1982) (footnotes omitted). That characterization hardly tallies with the petition in this case. Indeed, "[i]t must be remembered that the ultimate inquiry is whether the total time claimed is reasonable," Smith v. District of Columbia, 466 F. Supp. 2d 151, 158 (D.D.C. 2006), and the government does not suggest that the hours CREW billed are wildly disproportionate to either the scope of the litigation or the results. But while the sum requested is not, on the whole, outrageous, there is certainly some fuzziness around the edges. And even in the face of criticism from other judges, CREW has chosen to perpetuate that uncertainty with its approach—at least for Ms. Weismann— to maintaining and producing billing records. Because the petition contains deficiencies (ambiguity regarding time sheets and failure to provide them, particularly when taken together with the time increments and descriptions used here) that make the exact calculation of CREW's time difficult, the Court finds that an 18% reduction of CREW's requested hours is appropriate.

Besides its across-the-board concerns, the government also attacks several line items in CREW's billing summary as unnecessary expenses. The government first argues that the time Melanie Sloan—then-executive director of CREW, see Ex. E to Pl.'s Mot [ECF 38-6] at 2—spent on this case was "duplicative" and "non-productive." Def.'s Opp'n at 20. The government notes that Sloan's hours (4.5 total) consisted entirely of reviewing CREW's filings, as well as participation in one status conference. See Ex. E to Pl.'s Mot. at 5 (Sloan's billing summary). In the government's view, that is not enough participation—or at least not enough information. The government argues that "review" means "reading"—not "prepar[ing], edit[ing], or consult[ing]"— and so her work was "unnecessary." Def.'s Opp'n at 20–21. Without doing more, the government

claims, Sloan "acted as the client rather than as CREW's attorney." Id. at 21. And attorney's fees are of course unavailable to clients.

But the DOJ and Ms. Sloan have been down this road before. In previous fee litigation, the DOJ similarly argued that it should not have to pay for work Sloan performed because she was (theoretically) "involved in the case as the 'client' and not the attorney." CREW v. DOJ, 825 F. Supp. 2d at 231–32. That court found that Sloan sought "compensation for legal activities," including "reviewing the draft Complaint, consulting on the Meet and Confer Statement, reviewing the Joint Status Report, and reviewing the Motion at issue here." Id. at 232. In short, a similar role to that which Sloan played here, where she seeks most of her compensation for reviewing documents before filing. That earlier court found that Sloan was entitled to compensation for such activities, and the government provides no reason for this Court to depart from this previous holding.

The government also challenges the two hours Weismann expended for reviewing the Vaughn indices. See Ex. A to Pl.'s Mot. at 6 (billing one hour each for reviewing the Criminal Division and EOUSA Vaughn indices). CREW never challenged those Vaughn indices. Thus, according to the government, the "time spent reviewing them did not produce anything and did not contribute to CREW prevailing on an issue," Def.'s Opp'n at 22—a requirement for recovery, see Concerned Veterans, 675 F.2d at 1327 ("Fees are not recoverable for nonproductive time nor . . . for time expended on issues on which plaintiff did not ultimately prevail.").

Courts in this district have varied in their resolutions of this issue. Compare, e.g., Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 811 F. Supp. 2d 216, 239–40 (D.D.C. 2011) ("[I]t would seem critical to the prosecution of a FOIA lawsuit for a plaintiff to review an agency's disclosure for sufficiency and proper withholding during the course of its FOIA litigation. The

court thus awards fees related to the plaintiff's review of [the government's] disclosures."), and Elec. Privacy Info. Ctr. v. FBI, 72 F. Supp. 3d 338, 351 (D.D.C. 2014) ("While [plaintiff] did not subsequently challenge any of the [government's] redactions or seek further Court-ordered relief after the [government] finally produced the requested documents, it needed to review the documents before making those decisions."), with CREW v. DOJ, 825 F. Supp. 2d at 231 (agreeing with the DOJ that "Plaintiff is not entitled to recover for time spent reviewing the documents it instituted this lawsuit to obtain"). These courts agree that the operative statutory provision is that permitting recovery for "litigation costs." 5 U.S.C. § 552(a)(4)(E)(i). But they arguably disagree on whether review of Vaughn indices was a "post-relief activity, separate from the litigation," CREW v. DOJ, 825 F. Supp. 2d at 231 (internal quotation marks omitted), or one that occurred "during this litigation and before the parties stipulated that the underlying matter was settled," Elec. Privacy Info. Ctr., 72 F. Supp. 3d. at 351.

There may be a difference, however, between reviewing the documents produced (after the material sought has been obtained) and reviewing a Vaughn index to determine whether any further challenges to withholding are warranted. Timing and context will matter. In this case, Weismann conducted her review of the Vaughn indices containing the explanations for withholdings while litigation was still ongoing. Her review occurred on July 16, 2014, see Ex. A to Pl.'s Mot. at 6— well before the parties settled the dispute. See July 10, 2014 Mot. for Extension of Time [ECF No. 26] ("Plaintiff . . . is still in the process of reviewing documents produced by defendant and is not yet in a position to advise either defendant or this Court of the issues that remain to be litigated."). Thus, the Court considers Weismann's review of the Vaughn indices to be a reasonable "litigation cost" that merits recovery.

To recap: the Court accepts that the one-hour reduction in CREW's reply ameliorates concern about discrepancies between the billing summary and electronic time records. And the Court permits recovery for Ms. Sloan's work and for review of the <u>Vaughn</u> indices. In recognition primarily of CREW's failure to adhere to the standards for contemporaneous timekeeping set forth in previous cases, however, the Court will reduce CREW's hours by 18%. This reduction will not apply to the hours spent on the attorneys' fees briefing by Mr. Sobel, who "maintained a running, contemporaneous tally of time devoted to each discrete task performed," described each task in adequate detail, and recorded his time in six-minute increments. <u>See</u> Ex. C to Pl.'s Reply at 3.

### B.    Reasonable Hourly Rate

Having resolved the number of "hours reasonably expended in the litigation," the final issue is to determine a "reasonable hourly fee." <u>See</u> <u>Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc.</u>, 136 F.3d at 801. A reasonable rate must reflect "the prevailing market rates in the relevant community." <u>Blum v. Stenson</u>, 465 U.S. 886, 895 (1984); <u>Eley v. District of Columbia</u>, 793 F.3d 97, 100 (D.C. Cir. 2015). "[T]he burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." <u>Blum</u>, 465 U.S. at 895 n.11. The D.C. Circuit recently re-emphasized that the burden is on the fee applicant to justify the reasonableness of its requested rate. <u>See</u> <u>Eley</u>, 793 F.3d at 105 (vacating award of attorney's fees because "the district court erred in not requiring [the plaintiff] to demonstrate that her suggested rate was in line with those prevailing in the community for similar services" (internal quotation marks omitted)).

Fee applicants often rely on attorney's fee matrices as evidence of the prevailing market rate. <u>Eley</u>, 793 F.3d at 100. Such matrices set forth an hourly rate organized by years of attorney

experience.  See, e.g., Laffey v. Nw. Airlines, Inc., 572 F. Supp. 354 (D.D.C. 1983) (Laffey I),
aff'd in part, rev'd in part on other grounds, Laffey v. Nw. Airlines, Inc. (Laffey II), 746 F.2d 4
(D.C. Cir. 1984), overruled in part on other grounds, Save Our Cumberland Mountains, Inc. v.
Hodel, 857 F.2d 1516 (D.C. Cir. 1988) (en banc) ("SOCM"). The most commonly used fee matrix
is the Laffey matrix—a schedule of rates for lawyers who practice "complex federal litigation."
Eley, 793 F.3d at 100. The government agrees that the Laffey Matrix is the appropriate measure
of market rates for this case.  See Def.'s Opp'n at 23. But the Laffey Matrix, developed in the
1983 case Laffey v. Northwest Airlines, Inc., is more than thirty years old. Hence, the rates must
be updated to account for inflation.

Plaintiff proposes updating the Laffey Matrix with the "Legal Services Index Matrix" or
"LSI Matrix." The LSI Matrix uses as its starting point a Laffey matrix that was updated with
1988–1989 rates in the Save Our Cumberland Mountains litigation.  Ex. B to Pl.'s Mot. [ECF No.
38-3] at 4. It then accounts for inflation using the Bureau of Labor Statistics' legal services index,
which is based on the price movement of specific flat-fee legal services such as preparing a brief,
attending a deposition, and handling no fault divorce, living wills, and traffic violations. Id. at 7;
Attach. 1 to Def.'s Supp. Mem. [ECF No. 46-1] at 20 n. 26 [hereinafter "Malowane Decl."]. Using
the legal services index to update the SOCM Laffey Matrix results in a $753/hour rate for work
performed between June 2012 and May 2013 by attorneys with more than 20 years of experience
(like Ms. Weismann and Ms. Sloan), a $771/hour rate for work performed between June 2013 and
May 2014, and a $789/hour rate for work performed between June 2014 and May 2015. Ex. C. to
Pl.'s Mot. [ECF 38-4] at 2.

The government challenges the accuracy of the LSI Matrix and argues that CREW's
requested award is not reasonable. Def.'s Opp'n at 23–32. The question then is whether CREW

has "produce[d] satisfactory evidence . . . that the requested rates"—derived from the <u>Laffey</u> Matrix as updated for inflation by the legal services index—"are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." <u>Eley</u>, 793 F.3d at 100 (quoting <u>Blum</u>, 465 U.S. at 895 n.11).

To meet this burden, CREW's initial fee petition included the LSI Matrix along with: (1) declarations of its counsel attesting to the number of hours spent on the litigation, (2) the declaration of Dr. Michael Kavanaugh, originally submitted in another case, explaining the LSI Matrix, and (3) the 2012 National Law Journal ("NLJ") billing survey, offered as proof that the LSI Matrix rates are "consistent" with "rates for partners in four large Washington D.C. law firms," Pl.'s Mem. at 20. This initial submission does not take CREW very far. The D.C. Circuit held in <u>Eley</u> that a nearly identical record was insufficient to meet plaintiff's burden to justify the reasonableness of its requested rates. 793 F.3d at 104. There the plaintiff had submitted the LSI Matrix, Dr. Kavanaugh's declaration, and the lawyer's statement that he charged paying clients the rates in the LSI Matrix. <u>Id.</u>  Aside from the NLJ billing survey, CREW's initial evidence is identical to Eley's inadequate evidentiary submission. <u>See id.</u> In its supplemental briefing, CREW added the following evidentiary materials: (1) the declaration of David K. Colapinto, a partner at a Washington, D.C. public interest law firm focusing on whistleblower advocacy and employment law; (2) an eight-year-old declaration of Steven K. Davidson, a partner at a large D.C. law firm attesting to general market rates in 2007; (3) the 2012 affidavit of Nathan Lewin, a partner at a law firm specializing in Supreme Court and federal appellate litigation; (4) Westlaw reports from May and August 2012 that compile information based upon fee applications filed in bankruptcy cases by firms in D.C.; and (5) the 2014 Real Rate Report listing the median hourly fees billed for litigation partners in the District of Columbia.

While improved in quantity from CREW's initial submission, a close look at the record reveals that CREW has still not met its obligation to show that its requested rates are appropriate because the majority of CREW's evidence does not speak to the prevailing rate in Washington, D.C. for similar services by lawyers of reasonably comparable skill, experience, and reputation. Most notably, the bulk of the evidence reflects rates charged by lawyers at some of the nation's largest law firms. The NLJ survey, for example, reports on rates for partners in four Washington, D.C. firms that range in size from approximately 340 to 2,250 attorneys. Malowane Decl. at 16; see Ex. D. to Pl.'s Mot. [ECF No. 38-5] at 3 (listing median rates at Hogan Lovalls ($750), Dickstein Shapiro ($700), Patton Boggs ($665), and Holland & Knight ($560)). The Westlaw reports similarly "focus[] on the NLJ 250 firms," meaning the 250 largest firms nationally. Ex. D to Pl.'s Supp. Mem. [ECF No. 47-4] at 2.[5] Another offering from CREW is a declaration from a partner at Steptoe & Johnson (a firm of more than 500 attorneys) attesting to the reasonableness of a $650/hour rate being requested by attorneys at WilmerHale (a firm of more than 1,000 lawyers) based on his "knowledge of the fees that large, highly regarded law firms that have the capability to handle major litigation charge their clients." Ex. B to Pl.'s Supp. Mem. [ECF No. 47-2] at 7.

In considering the persuasiveness of this evidence, the Court first notes that many of these rates—drawn from CREW's own evidence—still fall below the rates that CREW is actually requesting. And even if it were true that this evidence showed that attorneys at these firms charge rates in line with the LSI Matrix, the question would still remain: is the fact that attorneys at some of the nation's largest firms charge rates above $700/hour evidence that such rate is the prevailing

---

[5] The May 2012 report identifies 17 attorneys with 20 or more years of experience; their average rate was $777/hour. Pl.'s Supp. Mem. at 6. The August 2012 report identifies 36 such attorneys, with an average rate of $752/hour. Id.

rate for FOIA litigation in the Washington, D.C. market? See Eley, 793 F.3d at 100. CREW says yes, relying on the affidavit of Nathan Lewin to support the position that the rates of partners at big law firms is the prevailing rate for attorneys engaged in complex federal litigation at D.C.'s small or boutique firms. Pl.'s Supp. Mem. [ECF No. 47] at 4–5. Lewin, a partner at a law firm specializing in Supreme Court and federal appellate litigation, states that "[i]n [his] experience, the rates of all firms in the complex federal litigation marketplace are comparable." Ex. C to Pl.'s Supp. Mem. [ECF No. 47-3] at 3.

But CREW's own sources—albeit portions omitted from the excerpts it submitted—rebut the proposition that rates are comparable across firms of all sizes such that the average rate at the biggest firms should be taken as the prevailing rate more generally. See Executive Summary, The 2014 Real Rate Report, at vii ("Of the more than 350 factors we tested, our analysis this year revealed that law firm size was the biggest driver of law firm rates . . . . In fact, the effect was so large that regardless of the market location or type of work performed, larger firms consistently charged higher rates."); Leigh Jones, Law Firm Billing Survey, The National Law Journal, Dec. 17, 2012 ("Big-firm lawyers still have a sweet deal. Top partners at major law firms continue to command premium hourly prices for their services."). And the government's survey data confirms a correlation between law firm size and hourly rates. For example, in 2014 the national average rates at a firm with 1 to 9 lawyers was $300 for an equity partner and $227 for an associate. Malowane Decl. at 14 (citing the 42nd Annual Survey of Law Firm Economics, 2014 Edition (hereafter, the "2014 Survey")). Those numbers increase to $454 and $280 for partners and associates at firms with more than 150 lawyers. Id. The government expert attributes this difference to the likelihood that "larger multinational firms may be able to command higher fees due to . . . an offering of more services, having a better national or international reputation, [or]

having the capacity to take on bigger or more complicated matters . . . . Clients seeking lower cost alternatives to the large firms may seek out attorneys from smaller firms." Id. Given the contrary evidence presented by the government's expert and CREW's own sources, the Court is simply not convinced by the lone Lewin affidavit that the rates charged by partners at the largest firms reflect the "prevailing" rate in the community. Rather, the Court agrees with the finding of Heller v. District of Columbia that evidence based upon the rates charged by practitioners at the largest law firms in D.C. does little to show "that plaintiff's requested rates are, in fact, the prevailing market rates for attorneys engaged in complex federal litigation outside of the 'big firm' context." 832 F. Supp. 2d 32, 45 (D.D.C. 2011). Therefore, CREW's data that is specific to big law firms does not lend meaningful support to meeting its evidentiary burden.

CREW argues, though, that precedent bars the Court from drawing these sorts of "distinctions . . . between attorneys practicing in different settings." Pl.'s Supp. Mem. at 5 n.3 (citing SOCM, 857 F.2d 1516, and Blum, 465 U.S. 886). But the D.C. Circuit reads these cases more narrowly: "Blum and SOCM held only that legal aid lawyers (Blum), lawyers in nonprofit law firms (Blum) and lawyers who charge either reduced rates or on a pro bono basis (SOCM) should receive fees based on the prevailing market rate charged by for-profit lawyers if they are doing the same type of litigation." Eley, 793 F.3d at 105 (emphasis omitted). Neither case establishes that the prevailing market rate charged by for-profit lawyers is necessarily the market rate charged by lawyers in the largest law firms. See id. Nor do they hold that distinctions cannot be drawn within the broad category of "for-profit lawyers" in order to determine the proper prevailing rate.

The Westlaw reports suffer an additional weakness in that they compile information based upon fee applications from D.C. lawyers providing one particular type of complex litigation

service, bankruptcy. Ex. D to Pl.'s Supp. Mem. [ECF 47-4] at 2.   That attorneys litigating bankruptcy cases charged an average of $777 per hour in May 2012 does not prove that this rate is in line with the prevailing rate for complex federal litigation, generally.   In fact, according to the 2014 Survey, bankruptcy litigation has the highest billing rates out of all litigation specialties for which the survey has individual data. Malowane Decl. 8 n.8. The Court recognizes that the <u>Laffey</u> Matrix is itself a relatively blunt tool used to calculate fees for the broad category of complex federal litigation.   It does not necessarily distinguish between, say, bankruptcy and FOIA litigation. But that does not mean that the Court should blind itself to the more nuanced distinctions in the varying types and costs of litigation when determining whether CREW's evidence persuasively shows that the LSI Matrix reflects prevailing rates for complex litigation services.   Relying on rates particular to the specialized field of bankruptcy does not advance CREW's argument that the LSI Matrix reflects reasonable rates for complex litigation services or FOIA litigation in particular.

What remains of CREW's evidence, then, is the single declaration of a D.C. public interest law firm partner and excerpts from the <u>Real Rate Report 2014</u>.   The rate report shows that in 2013 the median rate for litigation partners practicing in Washington, D.C. was $660.  Ex. G to Pl.'s Supp. Mem. [ECF 47-7] at 4.  For D.C. attorneys, regardless of practice area, with more than 21 years of experience, the median rate was $706.85.  <u>Id.</u> at 5.  Likely in recognition that these median figures still do not get CREW to its requested rate of $753 to $789 per hour, CREW contends that it is actually the third quartile figures that "are likely the more accurate benchmarks for complex litigation."   Pl.'s Supp. Mem. at 7 n.4. Without further explanation as to <u>why</u> the third quartile is more representative, this unsupported self-serving argument is unconvincing.   That leaves the Colapinto declaration as anecdotal evidence that partners with 20-24 years of experience at one

four-partner D.C. law firm with "expertise specifically litigating complex FOIA and Privacy Act cases" charge $789/hour. Ex. A to Pl.'s Supp. Mem. [ECF No. 47-1] at 3–4.

For all the reasons outlined above, CREW's evidentiary submission provides, at most, weak support for its position. Here, the persuasiveness of defendant's evidence is relevant to whether CREW's proffer is ultimately enough to satisfy its burden. See Eley, 793 F.3d at 100 ("[T]he opposing party remains free to rebut a fee claim." (internal quotation marks omitted)); id. at 104 (comparing the four cases cited by the plaintiff to the forty cases cited by the defendant); see also Covington v. District of Columbia, 57 F.3d 1101, 1110 (D.C. Cir. 1995) ("[D]efendants may challenge plaintiff attorneys' market data, in an effort to show that the submitted market rates are inaccurate."). In support of the argument that CREW has not requested a reasonable rate, the government has submitted the declaration of economist Dr. Laura A. Malowane,[6] which reviews various survey data. See Eley, 793 F.3d at 101 (confirming that survey data are appropriate evidence of the prevailing market rate). This data is not immune from methodological critique. It does, however, coalesce to cast significant doubt on CREW's contention that the prevailing market rate in D.C. for complex litigation services exceeds $750/hour.

For example, Dr. Malowane reviews the ALM Legal Intelligence's 2011 Survey of Law Firm Economics ("ALM Survey"), which reports that the average billing rate in the Washington, D.C. area for an attorney with more than 20 years of experience was $459. Malowane Decl. at 5–

---

[6] In its order for supplemental briefing, the Court expressed concern about the credibility of Dr. Malowane, who had averred in a previous case that the LSI Matrix rates were in line with market rates for the prevailing party's attorneys. Aug. 7, 2015 Order [ECF No. 44] at 5. This concern has been allayed by the explanation that the rates requested in that case were on behalf of attorneys at the 135th and 150th largest national firms. Def.'s Supp. Mem [ECF No. 46] at 13; see Ex. B to Pl.'s Reply Mem. [ECF No. 43-2] at 4–5. Because the attorneys in question were in fact lawyers at "big law" firms, Dr. Malowane opined that the $705–706 hourly rates requested were roughly comparable to the hourly rates charged by similarly large firms at the high end of the market as reflected in a National Law Journal Survey. See Def.'s Supp. Mem. at 13. Hence, it has been Dr. Malowane's consistent opinion that what constitutes a reasonable rate depends on the size of the law firm. The Court's reliance on Dr. Malowane's declaration should not be read as agreement that the prevailing rate differs so widely from case to case, but the Court is satisfied that Dr. Malowane has expressed a principled opinion and is a credible expert.

6.  Dr. Malowane also reviews the 2014 Survey, which reports that the national median rate for attorneys with 31 or more years of experience was $430.  Id. at 7–8.  Because these numbers are not particular to the type of legal services being provided, in the case of the ALM Survey, or to D.C., in the case of the 2014 Survey, Dr. Malowane offers an alternative two-step method for calculating the prevailing rate.  The first step is to identify the national billing rates of attorneys performing federal litigation.  Malowane Decl. at 7.  To do this Dr. Malowane relied on the 2014 Survey, which provides billing rates for more than a dozen litigation areas, but does not include a distinct category for federal litigation.  Id. at 7–8 & n.8.  She, therefore, relied on the category "other litigation," which she contends represents a conservative estimate because it provides the second and third highest median billing rates in the "21 to 30" and "31 or more" experience groups, respectively.  Id. at 8 n.8.  Dr. Malowane then adjusted this national billing rate to reflect the Washington, D.C., market using two alternative methods.  Under the first technique, Dr. Malowane adjusted for the regional differences between the national figures and figures for the South Atlantic Region.[7]  Id. at 9.  This method results in a median rate of $435 for an attorney with more than 31 years of experience.  Id. at 10.  Under the second approach, Dr. Malowane adjusted for the regional differences between the national figures and figures for eleven highly populated U.S. urban areas, including the D.C. metro area.[8]  Id. at 10–11.  This method results in a median rate of $512 for an attorney with more than 31 years of experience.  Id. at 12.

According to the USAO Laffey Matrix—the government's proposed method of updating the Laffey Matrix for inflation—the rate for an attorney with 20+ years of experience for June

---

[7] This area consists of Delaware, District of Columbia, Florida, Georgia, Maryland, North Carolina, South Carolina, Virginia, and West Virginia.  Malowane Decl. at 9.

[8] In addition to D.C., this grouping consists of Boston, Chicago, Dallas, Detroit, Los Angeles, Miami, New York, Philadelphia, San Francisco, and Seattle.  Malowane Decl. at 10 n.10.

2014 through May 2015 is $520.[9]   This model uses the original 1981–1982 Laffey numbers as a starting point.  See Eley v. District of Columbia, 999 F. Supp. 2d 137, 150 (D.D.C. 2013), rev'd, 793 F.3d 97 (D.C. Cir. 2015).  And it adjusts the billing rates each year "by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5."  Ex. A to Def.'s Opp'n at 10 n.3.  "Changes in the cost of living are measured by the Consumer Price Index for All Urban Consumers (CPI-U)" for the Washington-Baltimore metropolitan area, as provided by the Bureau of Labor Statistics.  Id.  This Consumer Price Index "combines the price changes of over a hundred thousand diverse commodities into a single measure," Ex. B to Pl.'s Mot. at 4, including "such diverse items as personal computer prices, funeral expenses, and movie tickets," Eley, 999 F. Supp. 2d at 153.

As hinted at above, the Court realizes that none of these approaches is unassailable.  The ALM Survey number is not federal-litigation specific; the 2014 Survey number is not D.C.-specific; Dr. Malowane's number rests on various assumptions including that D.C. rates match either the Southern Atlantic Region or other highly populated areas; and the USAO Laffey Matrix relies on the CPI, where legal services "account[] for less than .293% of the total spending represented" in the index, Ex. B to Pl.'s Mot. at 7.  But notwithstanding these imperfections, it is telling that all five approaches point to a rate well below what CREW requests.

Had CREW presented an alternative free from its own imprecisions, the relative similarity of the rates generated by the government's various alternative methodologies might have been less damning.  But the LSI method suffers from serious shortcomings as well.  It too reflects national

---

[9] The government complains that in other cases CREW has requested fees based on the USAO Matrix—as if this is somehow devastating to CREW's position.  See Def.'s Opp'n at 24.  This argument was properly rejected by another court in this district.  See CREW v. DOJ, No. 11-754, 2014 U.S. Dist. LEXIS 182098, at *13 (D.D.C. Aug. 4, 2014) ("The fact that Plaintiff chooses to now request that its fee be based on the Laffey Matrix measured by the Legal Services Index of the CPI[] has nothing to do with whether its former requests in other cases were justified or not.").

inflation trends rather than inflation within the local community. Eley, 793 F.3d at 102. And while it has the benefit of being specific to the legal industry, the LSI measures inflation of diverse legal services, not particular to complex federal litigation services, and primarily measures price inflation for flat-fee legal services, not hourly rates. Given these misalliances, the Court finds it no more likely that the LSI Matrix accurately reflects the prevailing rate for complex litigation services in Washington, D.C., than any of the other methodologies on the table. And CREW's attempt to prove up the rates generated by the LSI Matrix with its evidentiary submissions has fallen well short. In sum, CREW has not met its burden to show that the requested rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."[10] Eley, 793 F.3d at 100 (internal quotation marks omitted).

So then what rate is appropriate? Both parties agree that at least the USAO Matrix rates are warranted. Def.'s Supp. Mem. [ECF No. 46] at 6 n.3 (stating that CREW is entitled to the USAO Laffey Matrix rates "only because the Department of Justice has conceded them in this case"). In the absence of evidence from CREW satisfying its burden to establish that the LSI Matrix represents the prevailing rate in the relevant market, the USAO Matrix will be used.

---

[10] In reaching this conclusion, the Court has also considered the parties' citations to other attorney's fees decisions in FOIA cases as relevant evidence of the prevailing market rate for these types of cases. See Eley, 793 F.3d at 104 & n.5; id. at 101 (prevailing rates can be demonstrated by "evidence of recent fees awarded by the courts . . . to attorneys with comparable qualifications handling similar cases" (internal quotation marks omitted)). The government has identified twenty decisions in this district over the last five years that award attorney's fees in FOIA cases. See Def.'s Supp. Mem. at 4; App. 7 to Malowane Decl. (listing nineteen FOIA attorney's fees decisions in which it could be determined what hourly rate was requested); Def.'s Notice of Supp. Authority [ECF No. 48] (notifying the Court of Electronic Frontier Foundation v. DOJ, No. 12-1441, Sept. 30, 2015 Mem. Op. [ECF No. 47], a FOIA decision where the court applied the USAO Matrix rather than the LSI Matrix to determine a reasonable hourly rate). Of these twenty decisions, only four award fees above the USAO Matrix rate. App. 7 to Malowane Decl. Three of those four decisions rely on the now vacated district court opinion in Eley v. District of Columbia, 999 F. Supp. 2d 137. See CREW v. DOJ, 80 F. Supp. 3d 1, 3 (D.D.C. 2015); CREW v. DOJ, No. 11-1021, 2014 U.S. Dist. LEXIS 182097, at *22–23 (D.D.C. Oct. 24, 2014); CREW v. DOJ, 2014 U.S. Dist. LEXIS 182098, at *14. The fourth does not rely on either matrix. Am. Immigration Council v. U.S. Dep't of Homeland Sec., 82 F. Supp. 3d 396, 410 (D.D.C. 2015). CREW has not cited any additional decisions awarding attorney's fees above the USAO Matrix rate in FOIA cases.

Although the Court is not convinced that the USAO Matrix is the ideal measure of rates for complex federal litigation—given the discrepancy in applying the CPI to the legal industry—the Court is nonetheless comfortable applying the $520/hour rate because it is clearly not an outlier. As outlined above, four other approaches point to similar rates: $430, $435, $459, and $512.

This default to the USAO Matrix is due in part to the fact that CREW has accepted the Laffey Matrix as the original basis of a reasonable hourly rate. Pl.'s Mem. at 17–20. The only issue here was how that matrix should be updated for inflation. CREW did not otherwise attempt to articulate a rate, perhaps divorced from the original Laffey Matrix, that could be supported with "affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases [] and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." See Eley, 793 F.3d at 101. While the "use of the broad Laffey Matrix may be by default the most accurate evidence of a reasonable hourly rate," Nw. Coal. for Alts. to Pesticides v. EPA, 421 F. Supp. 2d 123, 129 (D.D.C. 2006) (emphasis added) (internal quotation marks omitted), the default position is not the only position. In other words, fee seekers are not constrained to seek only those rates reflected by an updated Laffey Matrix where there is sufficient evidence to support a finding that a different fee is the prevailing rate in the D.C. market for attorneys with similar qualifications doing similar work. See Covington, 57 F.3d at 1109 (D.C. Cir. 1995) ("[P]laintiffs may point to such evidence as . . . their own survey of prevailing market rates in the community."). Of course, it would be preferable to avoid such an ad hoc approach in favor of a standardized model—as the Laffey Matrix attempts to provide. But its current usefulness is undermined somewhat by the challenge of accurately updating for inflation. Given the deficiencies in both the LSI and USAO matrices for such inflation-based updating, this might be an appropriate time for an up-to-date,

comprehensive Laffey-inspired survey of the local legal market, one that presumably would not ignore size of firm as a relevant factor.  Until that happens, however, the best available approach is to employ the original Laffey Matrix updated for inflation—and based on the record here, that means employing the USAO Matrix not the LSI Matrix.

*   *   *

Thus, to recap once more: the Court will apply the USAO Laffey Matrix to set the relevant reasonable hourly rates, and will multiply those rates by 82% of the hours CREW billed in the underlying FOIA litigation.  The Court will similarly reduce the "fees on fees" awarded for the litigation of this attorneys' fees motion, as CREW "prevailed" only to that extent.  See Commissioner, I.N.S. v. Jean, 496 U.S. 154, 163 n.10 (1990) ("[F]ees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation."); see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 982 F. Supp. 2d 56, 61 (D.D.C. 2013) (awarding fee applicant "the same percentage of fees for fee litigation as it does for fees on the merits").  This 18% reduction will not apply to Mr. Sobel's hours, which were expended only on the attorney's fees briefing.  Because CREW prevailed not at all on the portion of its fees motion seeking the LSI matrix the Court will decline to award fees for that part of the briefing.  This results in a total fee award of $32,865.19.[11]

---

[11] Before June 2013, CREW spent 40.5 hours on the litigation (38.5 by Weismann, 2 by Sloan), which is multiplied by $505/hour to yield $20,452.50.  Between June 2013 and May 2014, CREW spent an additional 10.7 hours (8.45 by Weismann after subtracting one erroneous hour, 2.25 by Sloan), which is multiplied by $510/hour to yield $5,457.  Since June 2014, CREW spent an additional 2 hours on the underlying litigation at a rate of $520/hour, resulting in a charge of $1,040.  Together, the total cost for attorneys' fees on the underlying litigation is $26,949.50.  The Court then reduces this award by 18% for a sum of $22,098.59.

As for fees on fees, CREW spent a total of 15.5 hours on its fee motion (15.25 by Weismann, .25 by Sloan).  Multiplied by a rate of $520/hour yields a total of $8,060.  This figure is reduced by 18% plus an additional 13% to reflect the fact that 3 pages of the 23-page brief were devoted to the unsuccessful LSI argument.  This reduction yields a total of $5,561.40.  Sobel spent 14.3 hours on the reply brief at a rate of $520/hour for a total of $7,436.  The Court reduces that award by 30% because 6 pages of the 20-page brief were again focused on the LSI argument.  This reduction yields a total of $5,205.20.  CREW is not awarded fees for its unsuccessful supplemental brief focused solely on the LSI issue.  The sum of these figures is $10,766.60.

**<u>CONCLUSION</u>**

For the reasons discussed above, the Court will grant in part CREW's motion for attorneys' fees.  A separate Order has been issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>October 27, 2015</u>